POSNER, Circuit Judge,
dissenting.
Dismissal of the appeal in this class action suit is premature. It is based on speculation rather than on evidence, is insensitive to the risks of class action sellout, and makes critical errors.
We don’t know the terms of the settlement on which dismissal is predicated, so we don’t know whether the settlement sells out the interests of the class. But it may. In discounting that possibility the majority opinion makes two critical errors. The first is to say that “any other firm [that is, any other class member] could see that Liberty Mutual was appealing to defend its separate interests; none would have relied on Liberty Mutual.” Yet two subsidiaries of Liberty had submitted a separate appellate brief, arguing that the conflict between class members that were sued by AIG and those that weren’t required division of the class into subclasses, each with separate counsel. That was an argument on behalf of class members who were unrelated to the Liberty group.
The second mistake in the majority opinion is related: it is the statement that “all members of the class are large and sophisticated businesses, many with millions on the line and legal staffs to protect their interests. Even the smaller insurers receive more than $100,000 from the settlement, and if the representatives had been able to negotiate for the $3 billion the class initially sought, the average return per insurer would have exceeded $2 million (and about $750,000 apiece for the smaller insurers).” There are 1363 class members, and 55 percent of the settlement goes to just four of them, leaving $202 million to be divided among the other 1359. That is an average of only $148,638.87 apiece. It implies that many of the claims probably are much smaller. There is no basis for the assertion that all the insurers will receive at least $100,000 from the settlement, and no basis for estimating the maximum likely settlement.
Some class members had been counter-sued by AIG, but others had not been. The brief filed by Liberty’s subsidiaries argued that those who had not been had been undercompensated by the settlement because there was no reason to offset their claims by AIG counterclaims. Those class members might have relied on the brief of Liberty’s subsidiaries to advance this argument, foregoing the expense of filing their own appeals from the class action *759 and their own appeal briefs because their own claims may not have been large enough to justify the expense — and anyway why incur it when they had a champion, namely Liberty? And remember that, as far as we know, the class members have not been informed of the settlement of the appeals or of the motion to dismiss them. And so the appellate settlement may be a device by which AIG paid Liberty to desert the class on whose behalf (as well as its own) it purported to be appealing.
Rule 42(b) of the appellate rules does not require dismissal if the rule’s conditions for dismissal are satisfied; it says the court “may” dismiss if they are. Further process is necessary in this case before dismissal can be considered the responsible course for us to take. The class action device, as a substitute for individual suits or conventional joinder, can achieve economies in multi-party litigation and allow victims of wrongful acts to obtain legal relief they couldn’t otherwise obtain. But class actions are also rife with distorted incentives and conflicts of interest, which makes judicial review of class action settlements, whether at the trial or the appellate level, vital.
This class action suit charged AIG with having cheated other companies that write workers’ compensation insurance (the class members) and are required by state statutes to contribute to a workers’ compensation insurance liability pool (analogous to an assigned-risk pool for automobile liability insurance). Employers who cannot find an insurer willing to write them a workers’ compensation insurance policy because their business involves a high risk of injury to their employees obtain insurance from the pool.
Allocation of the cost of the liability pool among its members is based on the amount of workers’ compensation insurance that each member writes willingly. The suit charged that AIG cheated the other members of the pool by underreport-ing the premiums it received for the workers’ compensation insurance that it wrote willingly. Its underreporting is alleged to have caused the class members to pay a portion of what should have been AIG’s contribution to the pool. Liberty, one of the class members, became the named plaintiff and sought to become the class representative. Actually it designated two of its subsidiaries to be the named plaintiffs — the two subsidiaries that filed the separate appellate brief that I mentioned.
AIG responded by filing suits against a number of the members of the class, including Liberty, charging that they were cheaters too, because they too had un-derreported their premiums from the insurance they sold willingly. Liberty responded by filing counterclaims against AIG in AIG’s suit against it. The counterclaims accused AIG of having underreport-ed premiums in a number of states not involved in the class action. Liberty is the only member of the class that has individual as well as class claims against AIG.
AIG agreed to pay $450 million to the class to settle both the class claims and Liberty’s individual claims. Liberty wanted more. It argued that its counterclaims gave it leverage over AIG that should make AIG agree to a more generous settlement, because a settlement would buy AIG peace in the form of a release of those counterclaims. Liberty wanted to be compensated for selling AIG that peace. But it didn’t want just a bigger share of $450 million. It argued that AIG’s offer to the class was far too low, and not only because of the value Liberty assigned to its counterclaims. It wanted AIG to agree to pay $3.1 billion in settlement of the class action, of which $700 million would go to Liberty instead of a mere $99 million, its share of the $450 million ultimately awarded in the settlement. Of course if AIG *760 could be forced to pay $8.1 billion, all the class members — not just Liberty — would be better off. But AIG was unwilling.
With Liberty holding up settlement by its intransigence, ACE INA Holdings, Inc. and six other class members intervened in the district court, becoming parties. They were appointed class representatives for a settlement class, accepted AIG’s $450 million settlement offer, and asked the district judge to approve the settlement, which he did.
Only one class member objected to certification of the settlement class and ultimately to the settlement itself — Liberty. Its objections, renewed in these appeals that the majority has decided to dismiss blind, were not only that the settlement was too small but also, as I mentioned earlier, that the allocation of the $450 million among class members ignored the fact that some of them had been targets of counterclaims by AIG. Their share of the settlement should have been offset to reflect the value to them of AIG’s releasing those counterclaims, while the share received by the class members who had not been targets of AIG’s counterclaims should have been correspondingly increased — but were not. Instead the settlement money was divided in proportion to each class member’s share of the liabilities that it had incurred as a result of AIG’s misconduct, without any offsets. That is the basis of the argument advanced by Liberty’s subsidiaries in their separate brief that the judge should have created two subclasses with separate counsel, one for the members who were named in AIG’s counterclaims (and thus benefited from the release of those counterclaims, which was part of the settlement) and the other for those class members who weren’t. Representation of a class by one plaintiff or one group of plaintiffs is inadequate under Fed.R.Civ.P. 23(a)(4), (g)(4) if there is a potential dispute between factions within the class over allocation of settlement proceeds. Ortiz v. Fibreboard Corp., 527 U.S. 815, 856-59, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999); Amchem Products, Inc. v. Windsor, 521 U.S. 591, 625-28 and n. 20, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); In re Literary Works in Electronic Databases Copyright Litigation, 654 F.3d 242, 249-53 (2d Cir.2011).
Liberty’s unique individual claim to have been underpaid in the settlement because it was forced to release its counterclaims against AIG too cheaply has been resolved by the settlement with AIG of Liberty’s appeal. The money for that settlement— the money AIG is paying to persuade Liberty to drop its appeal — will not come out of the $450 million of class settlement money. Were it the only claim, therefore, summary dismissal of Liberty’s appeal under Fed. R.App. P. 42(b) would be proper. But since it’s not the only claim, to allow Liberty’s subsidiaries to withdraw their objection to the size of the settlement and to the alleged misallocation of settlement proceeds among the remaining class members could deny the class a shot at a larger and more equitably distributed settlement. If, pursuant to Liberty’s submission, AIG paid $3.1 billion in settlement, of which $700 million went to Liberty, $2.4 billion would go to the rest of the class rather than the $351 million ($450 million minus $99 million) that it will receive if the settlement approved by the district court stands.
As amended in 2003, Fed.R.Civ.P. 23(e) (in what is now subsection (e)(5)) says that “an objection [to a class action settlement] may be withdrawn only with the court’s approval.” As the committee note points out, the logic of the rule applies to the withdrawal of an objection on appeal. “Once an objector appeals, control of the proceeding lies in the court of appeals. The court of appeals may undertake re *761 view and approval of a settlement with the objector, perhaps as part of appeal settlement procedures, or may remand to the district court to take advantage of the district court’s familiarity with the action and settlement.” 2003 Committee Notes to Fed.R.Civ.P. 23(e). My concern is that the opposition of Liberty’s subsidiaries to the settlement may have led other members of the class not to appeal the allocation of the settlement proceeds, trusting that someone (namely the Liberty group) was carrying that ball for them. Class counsel, it is true, is not objecting to the dropping of the appeal. But if class counsel could always be trusted to be the loyal and competent representative of the class, there would be no requirement that class action settlements be submitted for approval by a court, with approval dependent on the outcome of a hearing to determine the fairness of the settlement to the class. “We and other courts have often remarked the incentive of class counsel, in complicity with the defendant’s counsel, to sell out the class by agreeing with the defendant to recommend that the judge approve a settlement involving a meager recovery for the class but generous compensation for the lawyers — the deal that promotes the self-interest of both class counsel and the defendant and is therefore optimal from the standpoint of their private interests.” Creative Montessori Learning Centers v. Ashford Gear LLC, 662 F.3d 913, 918 (7th Cir.2011).
For all we know, the amount that AIG has agreed to pay Liberty to drop its appeal is not just an estimate of the value of Liberty’s individual claim beyond its share of the class action settlement, but includes a “bribe” given to Liberty by AIG to take the issue of equitable allocation of settlement proceeds among class members out of contention because the issue if taken up by the appellate court (by us, that is) might be resolved against approving the settlement. I have pointed out that members of the class who are disappointed by the existing allocation may have been counting on Liberty to champion their cause in this court. But class action settlements require judicial review (the “fairness” hearing) even when there are no objectors, in recognition of the conflicts of interest that pervade class action litigation. Fed.R.Civ.P. 23(e), (e)(2); 4 William B. Rubenstein et al., Newberg on Class Actions § 11:48 (4th ed. 2012) (“despite a lack of opposition, the court should not lose sight of its responsibility to analyze independently and intelligently the settlement”); Federal Judicial Center, Manual for Complex Litigation § 21.61 (4th ed. 2004); cf. Mirfasihi v. Fleet Mortgage Corp., 551 F.3d 682, 686-87 (7th Cir.2008); In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation, 55 F.3d 768, 812-13 (3d Cir.1995).
So how should we proceed? We could remand the case to the district court for a determination of whether to approve the dismissal of Liberty’s appeal. But that would inject needless delay. A superior alternative would be to conduct our own investigation of whether to approve the settlement between Liberty and AIG. The first step would be simply to require submission to us of the settlement agreement. Maybe on reading it we’d conclude that it is innocuous and dismiss the appeals. But maybe not. According to Liberty its independent (nonclass) claim against AIG was valued at $25 million in the district court settlement. If Liberty’s appellate settlement with AIG exceeds that amount, this may be a clue that AIG is paying Liberty to drop objections to the settlement that, were they accepted, would benefit the class. In that event the class is being hurt by the blind withdrawal of Liberty’s appeal unless no more money can be squeezed out of AIG, which we don’t know.
*762 We should not dismiss the appeal without at least informing ourselves of the terms of Liberty’s settlement with AIG. In dismissing the appeals without doing so we are acting in haste, and for no good reason. The motion to dismiss the appeals was filed more than two months ago. Rather than arguing over whether to dismiss them we could within this period have completed the investigation that would reveal whether we should grant the motion.